In the Matter of THEODORE H. SILKMAN, an Attorney and Counselor
at Law.

*Jurisdiction of the Appellate Division to disbar a surrogate practicing as· an
attorney in violation of the Constitution — refusal of the court to allow him to
, practice before it — "population" defined.*

The Appellate Division has not jurisdiction, under section 67 of the Code of
∴ Civil Procedure, to suspend from practice or remove from his office as attor·
· ney, a surrogate who practices law during his term of office, in violation of
section 20 of article 6 of the State Constitution, which provides: "Nor shall
any Judge of the Court of Appeals or Justice of the Supreme Court or any
County Judge or Surrogate hereafter elected in a county having a popu-
lation exceeding one hundred and twenty thousand, practice as an attorney or
counselor in any court of record of this State or act as referee."

*Semble*, that if it appears that a surrogate is practicing law in violation of a con·
stitutional provision it is undoubtedly the duty and within the power of any
court of record in the State in which he attempts to practice law to prohibit
him from so doing.

*Quære*, whether the word "population," as used in the constitutional provision,
means the entire population or simply the citizen inhabitants excluding aliens.

GOODRICH, P. J., dissented.

HEARING upon the return of an order to show cause, issued out of
the Appellate Division, second judicial department, directing Theo--
dore H. Silkman, surrogate of the county of Westchester, to show
cause why an order should not be made suspending him from the
practice of the law during the continuance of his term of office as
surrogate.

*James M. Hunt*, for the motion.

*J. Rider Cady*, opposed.

HIRSCHBERG, J.:

This proceeding was instituted by Mr. James M. Hunt, an attor-
ney and counselor of the Supreme Court, by the presentation of
verified charges against the Hon. Theodore H. Silkman, surrogate
of the county of Westchester, accusing him, in the precise language,
of the charges, of "practicing as an attorney and counsellor at law
in the Supreme Court, Westchester county, and before this ·Appel-
late Division of the Supreme Court, said Supreme Court being a

court of record of this State, in violation of the provisions of section 20 of article VI of the Constitution of this State, and in violation of his official oath as surrogate of the county of Westchester, which oath was taken pursuant to the provisions of section 1 of article XIII of the Constitution of this State." An order was duly issued upon these charges requiring Mr. Silkman to show cause why an order should not be made suspending him from practice during the continuance of his term of office as surrogate, and why such other and further order should not be made as to the court might seem just. A hearing having been had upon the return of the order to show cause, we are now called upon to dispose of the proceeding.

The provision of the Constitution which Mr. Silkman is charged with violating is the following, contained in section 20 of article 6, viz.: " Nor shall any judge of the Court of Appeals, or justice of the Supreme Court, or any county judge or surrogate hereafter elected in a county having a population exceeding one hundred and twenty thousand, practice as an attorney or counselor in any court of record in this State, or act as referee." Mr. Silkman was elected surrogate at the general election in the year 1900, at which time it is claimed that the population of the county of Westchester largely exceeded the prescribed number; but it is contended in his behalf that the word " population," as used in the section of the Constitution cited, is to be confined to the citizen inhabitants, excluding aliens, and that so construed the population of the county at the time of his election was within the limit of 120,000.

The question has been argued with force and ability on either side, but in the view taken of our jurisdiction we do not deem it necessary or proper to decide it. Assuming that at the time of Mr. Silkman's election it be true that the county of Westchester contained a population exceeding 120,000 within the meaning of the section referred to, then it necessarily follows that upon taking office on January 1, 1901, he was by the express terms of the Constitution at once suspended from practice as effectively as he could possibly be by any order of this court. In so far as the application, therefore, seeks the expression of this court's opinion upon the abstract question of his right to practice in the absence of any special case in which he is assuming so to do, it but invites either the mere expression of opinion, or, at most, an order in the form of

a supplementary mandate indorsing and confirming the suspension already pronounced by the fundamental law. To be effective the action of the court should go beyond suspension already pronounced by the Constitution in the view now considered, and should result in disbarment, and the jurisdiction of the court should be considered with respect to the power to decree such disbarment.

The statutory power conferred upon this court in the premises is contained in section 67 of the Code of Civil Procedure, and, so far as applicable, it provides that "an attorney and counselor, who is guilty of any deceit, malpractice, crime or misdemeanor, * * * may be suspended from practice, or removed from office, by the Appellate Division of the Supreme Court." There is no charge in this case of the commission of any crime or misdemeanor, and the deceit and malpractice referred to relate, we think, to some act of professional deceit and malpractice. If, however, Mr. Silkman has violated the injunction of the Constitution, he has offended as surrogate, and not as an attorney. As an attorney his right to practice law is undoubted, and it is only as surrogate that it is or can be questioned, and it follows that the violation of the Constitution, if it has been violated, has been committed by him in his judicial or official rather than in his professional capacity.

But it is urged that the Appellate Division has "inherent" power to discipline lawyers, and that an offense committed by a judge in practicing when prohibited is likewise an offense committed by him as a lawyer which calls for the exercise of the inherent power. It may be conceded that an inherent power exists in the court by which attorneys are admitted to practice law, to discipline them in their profession for any conduct exhibiting turpitude or the loss of that good character which was essential to admission and which must be deemed equally essential to continuance at the bar. But in the case of transgressions by judicial officers, the Constitution provides for punishment by removal from office, which, in the absence of a distinct expression to the contrary, should be deemed exclusive. Section 11 of article 6 of the Constitution provides that judges of the Court of Appeals and justices of the Supreme Court may be removed by concurrent resolution of both houses of the Legislature on a vote of two-thirds of all the members elected to each house;

and that all other judicial officers, except justices of the peace and judges or justices of inferior courts not of record, may be removed by the affirmative vote of two-thirds of the members of the Senate on the recommendation of the Governor. Such removal must be preceded by a hearing and solemnized by the entry on the legislative journal of the votes of the senators. It cannot be that the law contemplates that the Appellate Division should possess the inherent power of disbarring the judges of the Court of Appeals and the justices of the Supreme Court as lawyers for the violation of judicial duty even though the violation may incidentally involve some professional impropriety. Mr. Hunt insisted upon the argument that it is within the power of the Appellate Division to disbar a judge of the Court of Appeals if he attempt to practice law, and it is evident that such a view is essential to the logic of his position. We think the statement of the claim carries its own refutation. Section 20 of article 6 of the Constitution provides that no one shall be eligible to judicial office, including that held by Mr. Silkman, who is not an attorney and counselor of this State. The disbarment, however, would not operate to remove the incumbent from his office, for that clearly can only be done in the manner prescribed by the Constitution. The absurd, not to say scandalous, result would, therefore, be exhibited upon the exercise of this alleged inherent power of a judicial officer disbarred for misconduct as an attorney, yet retaining his official place and power after he has thus been judicially decreed to be unfit and at the same time incidentally deprived of an essential constitutional element of eligibility.

We think the jurisdiction invoked does not exist and that the charges should accordingly be dismissed. It is proper, however, to add that if the fact was established that the county of Westchester at the time of Mr. Silkman's election did contain more than 120,000 of population within the meaning of the Constitution, it would undoubtedly be the duty and within the power of any court of record in the State in which he should attempt to practice law to prohibit and prevent him from so doing. All we decide is that we are not called upon to give an abstract opinion upon his right to practice law or to act as referee, in the absence of an actual case brought within our jurisdiction and involving the question ; that a suspension pronounced by this court would add nothing to the force

of a supension pronounced by the Constitution of the State; and that under the circumstances of the case neither the suspension nor disbarment of judicial officers as attorneys being embraced within the express statutory jurisdiction conferred upon the court, such jurisdiction should not be assumed under the guise of inherent power.

BARTLETT and HOOKER, JJ., concurred; WOODWARD, J., concurred in separate opinion; GOODRICH, P. J., read dissenting opinion.

WOODWARD, J. (concurring):

I would content myself with a simple concurrence in the views expressed by Mr. Justice HIRSCHBERG, were it not that I feel that the dissenting opinion of Presiding Justice GOODRICH does not present the correct view of the law, in so far as it relates to the question of population for political and administrative purposes. In passing, it may be proper to suggest that, while the definitions quoted from the standard dictionaries correctly defined the word "malpractice" in the abstract, I am clearly of the opinion that as applied to practitioners before this court it must have some relation to the discharge of professional duties. As was said in *Matter of Baum* (5 Silv. S. C. 463): "Malpractice as a lawyer means evil practice in a professional capacity and the resort to methods and practices unsanctioned and prohibited by law," and in *Case of J. V. N. Yates* (4 Johns. 367) it was said that "the word *malpractice* is an appropriate term for a contempt committed by an attorney or solicitor, in abusing the practice of the court." So in *Mayor, etc., of Macon* v. *Shaw* (16 Ga. 186) it was held that the crime of gambling by a city marshal did not constitute "malpractice in office" within a statute authorizing his dismissal for such malpractice, and I know of no rule of construction which warrants an enlargement of the jurisdiction of a court of justice for the purpose of limiting human liberties.

Theodore H. Silkman, an attorney and counselor at law, was elected to the office of surrogate of Westchester county, and entered upon the discharge of his duties as such officer on the 1st day of January, 1901, after having taken and subscribed the constitutional oath of office, and it is admitted that he has continued to

practice his profession and to act as a referee from that time up to the present. It is alleged on the part of the moving parties that the county of Westchester has a population in excess of 120,000, and, if this allegation is true, within the letter and spirit of the provision of section 20 of article 6 of the Constitution above set forth, there can be no doubt that it is the duty of Mr. Silkman to refrain from further activities along the lines which he has been following. Generally speaking, the right of one to use his faculties in all lawful ways, to live and work where he will, to earn his livelihood in any lawful calling, and to pursue any lawful trade or vocation, is the constitutionally declared right of the individual. (*Matter of Jacobs*, 98 N. Y. 98, 106, 107, and authorities there cited.) While it is not to be doubted that it is within the powers of the State to determine the conditions upon which any person may accept public office, it is no part of the duty of the courts to extend the limitations thus made beyond the letter and spirit of the enactment. Mr. Silkman has a right to practice his profession; this right is guaranteed by both the State and Federal Constitutions, and in accepting the office of surrogate he is not deemed to have sacrificed any of those rights beyond the strict letter of the constitutional requirement, read in the light of those rules of interpretation and construction with reference to which all laws are presumed to have been enacted. There is no respectable authority with which we are familiar which warrants the construction of statutes or constitutions to take away the fundamental rights of the individual beyond the strict letter and spirit of the law, and the authorities are numerous that where the enactment creates a new rule, unknown to the common law, it should be construed strictly against the State or municipality, and liberally in favor of the citizen. (*Sprague* v. *City of Rochester*, 159 N. Y. 20, 26; *Schneider* v. *City of Rochester*, 160 id. 165, 172, and authorities there cited.) A constitution is an instrument of government made and adopted by the people for practical purposes connected with the common business and wants of human life (*People* v. *New York Central Railroad Co.*, 24 N. Y. 485), and should be construed to promote the great objects for which it was made (*North River Steamboat Co.* v. *Livingston*, 3 Cow. 713, 750), without unnecessarily infringing upon the rights of individuals. In giving construction to a constitutional pro-

vision the whole provision is to be considered, and the real intent should prevail over the strict letter, but that intent must be gathered from the language, unless this would lead to palpable injustice, contradiction or absurdity. (*Adams* v. *East River Savings Institution*, 136 N. Y. 52.) And "all words, whether they be in deeds or statutes, or otherwise, if they be general and not express and precise, shall be restrained unto the fitness of the matter or person." (*Union Hotel Co.* v. *Hersee*, 79 N. Y. 454, 461, citing Bacon's Max. Law, Regula X.) Having these general rules in mind, and keeping in view the duty of this court to use care that in the administration of the law it does not permit any member of this State to be disfranchised or deprived of any of the rights or privileges secured to any citizen thereof, unless by the law of the land or the judgment of his peers (State Const. art. 1, § 1), let us examine the Constitution of this State and see if it is necessary, in carrying out the great purposes for which it was designed, to deprive Mr. Silkman of his natural right to use his faculties in discharging his duties as an attorney and counselor of this court at the same time that he is engaged in the work of administering the office of surrogate of Westchester county.

What are we to understand by the words "having a population exceeding one hundred and twenty thousand," as used in section 20 of article 6 of the State Constitution? Is the word "population" one of so precise definition that it may not be "restrained unto the fitness of the matter" and be made to conform to the spirit of the instrument in which it is used? We think not, and we are clearly of opinion that the words "having a population," when used in the Constitution of this State, which is to be considered as a whole, complete in itself, force to be given to every provision contained in it, and each clause explained and qualified by every other (*People ex rel. Balcom* v. *Mosher*, 163 N. Y. 32, 36), are to be understood as limited to the resident citizen population of the county. The Constitution of the State is a complete instrument; it provides for the creation of the departments of the State and limits the powers of the several departments, and when it speaks of the population of the State, or of any of the subdivisions of the State, we are to find the meaning of the words from the sense in which they are used in connection with the other clauses of the instrument. The Constitution (Art. 3, §§ 4, 5) provides a way of determining the population

of the State for political purposes, and the readjustment of the political divisions of a sovereignty with a view of the representation of those divisions, or of the inhabitants thereof, in the Legislature, is in its nature a political power as distinguished from a legislative or judicial power. (*People ex rel. Carter* v. *Rice*, 135 N. Y. 473, 499.) This power, it is said by the same authority, resides "in the first instance with the people, who in this country are the source of all political power." But it is to be observed that the words "the people," as used in a constitutional sense, although as precise and comprehensive as "population," do not include all of the inhabitants of the State, in its broadest sense. The first Constitution of this State, adopted in 1777, "in the name and by the authority of the good people of this State," ordained, determined and declared "that no authority shall, on any pretense whatever, be exercised over the people or members of this State, but such as shall be derived from and granted by them." But it is a well-established fact that the negro inhabitants of the State, then in a state of slavery, were given no voice in the election of representatives, or in determining any of the political questions of the day. (*People ex rel. Carter* v. *Rice, supra,* 493 ; *Dred Scott* v. *Sandford,* 19 How. [U. S.] 393, 408, 410; 2 Kent Comm. [14th ed.] *254–256.) It is equally true that the Indians who occupied reservations or the territory of which they were the original owners of the soil within this State, were no part of "the people," but were regarded as dependent nations, wholly distinct from the white community. (*Dred Scott* v. *Sandford, supra,* 403 ; *Cherokee Nation* v. *State of Georgia,* 5 Pet. 1.) "The words 'people of the United States' and 'citizens' are synonymous terms, and mean the same thing," say the court in *Dred Scott* v. *Sandford* (*supra,* 404). "They both describe the political body who, according to our republican institutions, form the sovereignty, and who hold the power and conduct the Government through their representatives. They are what we familiarly call the 'sovereign people,' and every citizen is one of this people, and a constituent member of this sovereignty." Again the same authority says : "It is true, every person, and every class and description of persons, who were at the time of the adoption of the Constitution recognized as citizens in the several States, became also citizens of this new political body ; but none other ; it was formed by them, and for them and their posterity, but for no one

else." If "the people " in a constitutional sense means citizens, it is equally true that in a general sense people constitute population. Webster's Dictionary defines people: "2. Persons, generally; an indefinite number of men and women; folks; population, or part of population." The same authority defines population to be "The whole number of people, or inhabitants, in a country, or portion of a country." Cooley in his Constitutional Limitations (6th ed. p. 754) says that "the words 'inhabitant,' 'citizen,' and 'resident,' as employed in different constitutions to define the qualifications of electors, mean substantially the same thing." Mr. Chief Justice TANEY, in the *Dred Scott Case* (*supra*, 403), in speaking of the negro, says: "The situation of this population was altogether unlike that of the Indian race," etc., thus giving a limited use of the word, and indicating that it is not necessarily used in a comprehensive sense. When we find, therefore, in the preamble to the first Constitution a quotation from the resolves of the Continental Congress, that " whereas, his Britannic majesty, in conjunction with the lords and commons of Great Britain, has, by a late act of parliament, excluded the inhabitants of these united colonies from the protection of his crown," we are to understand that the reference is to the inhabitants or the people of the political community to which reference is made, and not to the negroes, Indians or other aliens who may have been within the territorial limits, and as the people and inhabitants made up the population of the State in its political aspects, when we find the first Constitution providing for an enumeration of the inhabitants, for the purpose of determining, adjusting and maintaining the equal political powers of the various subdivisions of the State, we are justified in concluding that it was the purpose of the provision to enumerate the political population or the people, using these words in their constitutional sense. As showing how words of comprehensive scope may be limited by circumstances, the court, in the *Dred Scott Case* (*supra*, 410), in speaking of that clause of the Declaration of Independence which declares, "We hold these truths to be self-evident: that all men are created equal; that they are endowed by their Creator with certain unalienable rights," etc., say: "The general words above quoted would seem to embrace the whole human family, and if they were used in a similar instrument at this day would be so understood. But it is too clear

for dispute that the enslaved African race were not intended to be included, and formed no part of the people who framed and adopted this declaration; for if the language, as understood in that day, would embrace them, the conduct of the distinguished men who framed the Declaration of Independence would have been utterly and flagrantly inconsistent with the principles they asserted," etc. "They spoke and acted according to the then established doctrines' and principles, and in the ordinary language of the day, and no one misunderstood them. The unhappy black race were separated from the white by indelible marks and laws long before established, and were never thought of or spoken of except as property, and when the claims of the owner or the profit of the trader were supposed to need protection."

When the people, the custodians of the political power of the State, as distinguished from negroes and other aliens present within the territory, met and in the name of the "good people of this State" enacted a Constitution for the government of themselves through legislative, judicial and executive departments, they provided, among other things, for the creation of a legislative power, consisting of two houses, the representatives in which were apportioned to the then existing counties, and it was also provided (Const. [1777] § 5) "That as soon after the expiration of seven years, subsequent to the termination of the present war, as may be, a census of the electors and inhabitants of this State shall be taken, under the direction of the Legislature. And if on such census it shall appear that the number of representatives in assembly from the said counties is not justly *proportioned to the number of electors in the said counties respectively,* that the Legislature do adjust and apportion the same by that rule. And, further, that once in every seven years, after the taking of the said first census, *a just account of the electors resident in each county* shall be taken, and if it shall thereupon appear that the *number of electors* in any county shall have increased or diminished one or more seventieth parts of the whole number of electors, which on the said first census shall be found in this State, the number of representatives for such county shall be increased or diminished accordingly, that is to say, one representative for every seventieth part, as aforesaid." The electors, who will be seen to have constituted the basis of representation in the Assembly, were to con-

sist of every " male inhabitant of full age, who shall have personally
resided within one of the counties of this State for six months imme-
diately preceding the day of election,   *   *   *   if during the
time aforesaid, he shall have been a freeholder, possessing a freehold
of the value of twenty pounds, within the said county, or have
rented a tenement therein of the yearly value of forty shillings, and
been rated and actually paid taxes to this State," with a special pro-
vision for the freemen of the cities of Albany and New York.
(Const. [1777] § 7.) It was also provided (§ 8): " That every elector,
before he is admitted to vote, shall, if required by the returning officer
or either of the inspectors, take an oath, or if of the people called
Quakers, an affirmation, of allegiance to the State." Very similar
provisions were made for the Senate (§ 10 *et seq.*). It thus appears
that in the original Constitution the *electors,* who were *inhabitants
who could take an oath of allegiance to the State, thus becoming
citizens,* constituted the basis of representation. It was a purely
political regulation, and the provision for a census of " the electors
and inhabitants of this State," was understood to be a census of the
electors and citizens of the State, and it is to be observed that the
subsequent censuses at periods of seven years were confined to the
*electors, who were citizens.* The whole scope and purpose of
the census provided in the original Constitution was to *determine,
adjust and maintain the political equilibrium of the citizenship,*
in whom rested the sovereign powers and authority of the State.
(Const. [1777] § 1.) Construing a provision of the Constitution of
New Hampshire, that "every male inhabitant of each town"
should have the right to vote, *Opinion of the Court* (8 N. H.
574) lays down the opinion of the court that " the term 'inhabit-
ant,' as used in this relation, was not intended to include all resi-
dents ; and reasons of public policy seem to show, conclusively, that
it must be confined to such *inhabitants as are citizens* of the State."
Cooley in his Constitutional Limitations (5th ed. 754) says : " The
words ' inhabitant,' ' citizen,' and ' resident,' as employed in different
constitutions to define the qualifications of electors, mean substan-
tially the same thing ; and one is an inhabitant, resident, or citizen
at the place where he has his domicile or home." (See *Shaw* v.
*Quincy Mining Co.,* 145 U. S. 444, 451.) That this constitutional
provision for a *census of the inhabitants* was not intended to be an

enumeration of all of the persons who inhabited the State for the purpose of *determining its population*, is evidenced by the universal practice of taking a separate enumeration of the Indians upon the various State reservations, and never including their number in the returns of population for the counties in which such reservations are located. (See Exhibit D, Senate Document No. 60, for the year 1892; see, also, Laws of 1892, chap. 5.) It is also important to note that for some purposes corporations created under the laws of New York are inhabitants of the State (*Shaw* v. *Quincy Mining Co., supra*, 444, 451; *Galveston, etc., Railway* v. *Gonzales*, 151 U. S. 496, 503), although never appearing in the enumeration of inhabitants, and an act which imposed the burden of making and repairing bridges upon the inhabitants in a town or county has been held by that term to include all holders of houses and lands in the locality, whether resident or not, but as excluding actual dwellers who had no ratable property in the place, such as servants, etc. (*Union Hotel Co.* v. *Hersee*, 79 N. Y. 454, 461, and authorities there cited.) These and many other authorities might be cited to show that the word inhabitants has no exact definition, and that it comes, therefore, within the rule cited above from Bacon's Maxims of the Law, and must " be restrained unto the fitness of the matter." That is, in the use made of it in reference to an *enumeration of the inhabitants* for the purpose of fixing the political equilibrium of the State, *it should be confined to those who are the actual or potential custodians of the political power of the State; to the citizens of the State;* and if, for statistical or other purposes, it is desirable that the number of aliens should be shown, *this has no relation to the political population of the State, the determination of which was the sole object of the constitutional provision.* This was the view of the Constitution which went into effect on December 31, 1822, for it was provided (Const. [1821] art. 1, § 6): " An enumeration of the inhabitants of the State, shall be taken, under the direction of the Legislature, in the year one thousand eight hundred and twenty-five, and at the end of every ten years thereafter; and the said districts shall be so altered by the Legislature, at the first session after the return of every enumeration, that each senate district shall contain, as nearly as may be, an equal number of inhabitants, excluding aliens,

paupers and persons of colour not taxed; and shall remain unaltered until the return of another enumeration, and shall at all times consist of contiguous territory," etc. Similar provision was made in reference to the Assembly (Art. 1, § 7) and it is *clear that the enumeration contemplated merely taking into consideration the political citizenship of the State as a foundation for the adjustment of the representation of the persons who constituted the sovereignty of the State, without any reference to aliens or those who were excluded from the elective franchise. There being no other purpose to be served than to determine the number of citizens who were entitled to representation in the political affairs of the State, it follows that the enumeration of inhabitants required by the Constitution was of the citizen inhabitants,* and the further provision that aliens and paupers and persons of color not taxed should be excluded in calculating the basis of representation was merely for greater certainty, and indicated the policy of the State to exclude from the political or governmental powers all such persons as could not be relied upon to sustain and support the government. This was further evidenced by a change in the language of the qualifications for voters, conferring such qualifications on a male citizen "of the age of twenty-one years, who shall have been an inhabitant of this State one year preceding any election." (Art. 2, § 1.) By inference the elector must have been a citizen before, but now it was made necessary by a positive requirement, and the word "inhabitant" is used in the sense of a resident of the State, but likewise in connection with his citizenship. The Constitution of 1846 (Art. 3, §§ 4, 5) practically re-enacted the enumeration provisions of the previous Constitution, and the growing population of the State for the first time demanded a radical reorganization of the judicial department, and it was provided by section 4 of article 6 that the State should be divided into eight judicial districts, of which the city of New York should be one, and the others were to be bounded by county lines and to "*be compact and equal in population* as nearly as may be," and while the question was never raised, so far as we are able to discover, it is hardly to be doubted that the same rule of determining the apportionment of these judicial districts and the justices who were to hold the court prevailed which was prescribed for the Legislature; the *population and apportionment were deter-*

*mined by the enumeration provided for by the Constitution*, leaving out of the calculation all other than citizens of the State, and the Constitution of 1894 makes this clear in section 1 of article 6 by providing that the successors of the justices shall be *chosen by the electors* of their respective judicial districts, and that the "*Legislature may alter the judicial districts once after every enumeration under the Constitution of the inhabitants of the State*, and thereupon reapportion the justices to be thereafter elected in the districts so altered."

The essential error in the reasoning of the learned presiding justice, as I view this question, is that he seeks to give a popular general meaning to words which are used in a limited sense, failing to construe them in the connection in which they are used. He says: " The words ' inhabitants, excluding aliens ' are used in sections 4 and 5 of article 3 in reference to the exercise of political powers, while in article 6, section 20, the word ' population ' is used with reference to judicial functions. In the exercise of political power aliens are not entitled to consideration as they have no participation therein, but their rights are to be regarded in respect of judicial functions which may come to have jurisdiction over their property." What right or interest has an alien in the mere machinery through which the laws are administered more than in the making of the laws themselves ?  " We, the people of the State of New York, grateful to Almighty God for our freedom, in order to secure its blessings, do establish this Constitution." (Preamble to State Const.)   It is not " We, the people *in* the State of New York," but " We, the people *of* the State of New York ; " we who have interests and citizenship ; we who are " grateful to Almighty God for our freedom " — for that freedom and liberty which is ours by virtue of our birth and citizenship within the State, who ordained this Constitution.   When we reflect that " We, the people of the State of New York," who have ordained this Constitution ; we who have formulated and adopted its provisions, without any aid or assistance from any of the Indians, disfranchised persons or aliens, do not constitute all of the inhabitants or population, using those words in their broadest sense, but merely those in whom is vested the sovereignty of the State, it seems absurd to say that the word " population," used in the same instrument, and with reference

merely to a matter of policy, can be enlarged to cover all of those who may happen to be within a political division, so as to enable aliens to encroach upon the franchises of a citizen of this State. The creation of judicial tribunals, the limitations which shall be imposed upon those who are called upon to discharge judicial functions, and all of the details of administration, are merely matters of a political nature with which aliens have no concern, and to give the word " population " the scope contended for, and thus negatively empower the aliens who may be present in a political division of a State to determine its public policy, is to extend the scope of the Constitution to enfranchise those who have no part or interest in our political institutions, and to give to the word " population " a broader meaning than " the people."  All the interest that an alien can have in our institutions and laws is that he shall be protected under them, and this is abundantly guaranteed under those comprehensive provisions found in sections 1 and 6 of article 1 of the State Constitution, section 1 of the 14th amendment of the Federal Constitution, and that general comity which regards the rights of citizens of friendly states.  Where the State Constitution intends to include within its provisions aliens as well as citizens, it adopts appropriate language for that purpose.  In the 1st section of article 1, which is intended to guard alike the rights of citizens and aliens, it is provided that " no member of this State shall be disfranchised or deprived of any of the rights or privileges," etc.  In the 6th section of article 1, where the purpose is the same, it is provided that " no person " shall be " deprived of life, liberty or property without due process of law," and the same comprehensive language is found in section 1 of the 14th amendment of the Federal Constitution, while in all matters which relate to the political institutions of the country, more general language is used, but it is always to be understood as limited to " We, the people of the State of New York," or " We, the people of the United States," who are desirous of securing " the blessings of liberty to ourselves and our posterity," for those are the people who make the Constitution and the laws, and it is a maxim of our institutions that those governments derive their just powers " from the consent of the governed," and not from those who are temporarily within our jurisdiction, or those who are not amenable to our laws.  Aliens, therefore, not constituting a part of " We, the

people of the State of New York," or of the United States, cannot properly be contemplated in any provision which relates to the political powers or limitations of the State; they are to be treated as though they had no existence, in so far as the political functions of the State are concerned, but when the State has acted; when it has formulated constitutions and laws, the alien who is present within our boundaries has a natural and constitutional right to demand that he be given the equal protection of those laws. (*Yick Wo* v. *Hopkins,* 118 U. S. 356, 367, 369.) As the Constitution derives no force or power from Indians or other aliens, it cannot, in the absence of express language, be supposed to have been enacted with reference to them, and when it makes a political right, or the limitation of a political or civil right, to depend upon the population of the State, or of any subdivision of the State, it follows logically that it contemplates the population which constitutes "We, the people," and has no reference to Indians or other aliens who are no part of the people of the State, although they may be within the State. The people of the State are those who constitute the State, while aliens are in contemplation of law merely temporarily sojourners, here by our courtesy, and owing no other duty to the State than obedience to its laws. It might just as well be said that the constitution of the Brooklyn Club, in its governmental powers, was made with reference to the visitor of a day, as to hold that the Constitution of this State contemplated that its alien population should be reckoned in determining the right of any citizen to practice his profession within the county of Westchester, or any other subdivision of the State. It was "We, the people of the State of New York" who were represented in the Constitutional Convention; it was "We, the people of the State of New York" who ratified and adopted the Constitution, and not one of us had any idea that it was designed for any other purpose than defining and limiting the governmental powers of "We, the people of the State of New York."

As we have already pointed out, the judiciary article of the Constitution, under which it is urged Mr. Silkman is denied the right to practice his profession in Westchester county, recognizes the enumeration provision of the Constitution as controlling in fixing the judicial districts, which, like those of the Legislature, are to be

based upon the citizen population, and it follows, under well-established rules of construction, that *section 20 of article 6 must be read and construed in connection with section 4 of article 3, the enumeration section, which provides the only method of determining the population of the State or any of its subdivisions for political purposes.* The whole provision is to be considered, and the real intent should prevail over the strict letter, but that intent must be gathered from the language, unless this would lead to palpable injustice, contradiction or absurdity. (*Adams* v. *East River Savings Institution*, 65 Hun, 145, 149; 47 N. Y. St. Repr. 175, 179; affd., 136 N. Y. 52.) Surely the language of the section, read in connection with the whole judiciary article, that being understood in the light of the entire Constitution, can bear no other construction than that the *population of 120,000*, which determines the rights of Mr. Silkman in this proceeding, is the *political population of the county; the citizen population which has the power to participate in the making of the Constitution and its limitations*, as well as in the election of the surrogate. *To say that it means the entire number of people who may be found within the county, regardless of their relations to the institutions of the State and county; that it means aliens who are excluded from participating in the election of the surrogate, or the members of the judiciary and the legislative department, or even from aiding in determining the population of the legislative and judicial districts for the purpose of apportioning the officers among them, is closely to approximate an absurdity*, and for no other purpose than to prevent an individual from making the most advantageous use of his faculties in the earning of a livelihood. We do not believe that it was the intent to give to the aliens of Westchester county, who are denied all other political powers, the capacity to work this disfranchisement; the evils to be reasonably anticipated from a continuance of the surrogate of that county to practice law does not justify any forced construction to prevent it, and as the provision can have its full force and effect under the enumeration provided for in 1905, if the facts then disclosed warrant it, and the construction which we have suggested seems in full harmony with the spirit and intent of the Constitution, taken as a whole, *we are disposed to hold that the words " having a population," in section 20 of article 6 of the Constitu-*

*tion, are to be construed as meaning citizen population.* The only object of the *enumeration,* as we have seen, was to determine the *citizen population of the State for the purpose of maintaining the equilibrium of political powers between the various districts and counties, without any reference to the alien population,* whose rights are fully protected under the administration of the laws which bear equally upon ourselves, and *when the Constitution makes the population of a county or district the measure of civil or political rights it is doing no violence to language to say that it refers to the citizen population, which alone has any standing in measuring or determining political, governmental or civil rights. The Constitution, in its political aspects, is concerned only with the citizenship of the State; aliens have no rights except to an equal administration of the law, and it cannot be presumed that in making the Constitution of 1894, which introduced this new limitation, the convention or the people who adopted it had any idea that they were giving to aliens in any part of the State the power, by their mere presence in any given locality, to determine the political or civil rights of any citizen of this State.* Had such a proposition been suggested directly there can be little doubt that the Constitution would have remained as it was, and it may not be assumed that there was an intention within the language and spirit of the Constitution which would thus have been fatal to it. " The use of a wrong word, conceding it to be such," say the court in *Blaschko* v. *Wurster* (156 N. Y. 437, 442), " which was doubtless an inadvertence, should not be allowed to defeat the intention of the law. When the intention of the law-makers is discovered it must always prevail over the literal or accepted meaning of words. The courts will consider the mischief which the statute was aimed at, and in order to give it effect words absolute in themselves, and language the most broad and comprehensive, may be qualified and restricted by other parts of the same statute, or by the facts and circumstances to which they relate." (Citing *Smith* v. *People,* 47 N. Y. 330 ; *People ex rel. Jackson* v. *Potter,* Id. 375.) The dictionaries (Webster and the Century) define *population,* " The whole number of people *or inhabitants,*" and the Century adds, " *a part of the inhabitants in any way distinguished from the rest;* as, the German population of New

York." If we give to the word *inhabitants* its political definition — *citizens* — or recognize the clear distinction made by the Constitution between citizens and aliens, we shall have little difficulty in bringing the case within the literal definitions of the dictionaries, but this does not seem to be necessary, under well-established rules of interpretation, and it has been said by no less an authority than the Court of Appeals that "it would be dangerous in the extreme to extend the operation and effect of a written Constitution by construction beyond the fair scope of its terms, merely because a restricted and more literal interpretation might be inconvenient or impolitic, or because a case may be supposed to be, to some extent, within the reasons which led to the introduction of some particular provision, plain and precise in its terms." (*Settle* v. *Van Evrea,* 49 N. Y. 280, 281.) The provision of section 20 of article 6 is one of expediency merely ; no great principle of human rights is involved in its enforcement, and it was introduced into the fundamental law only because it was alleged that in some instances, in the larger communities, the minor judicial officers had been negligent in a measure of their official duties because of the demands of their practice, and we see no reason why the presence of a few thousands of aliens in the county of Westchester, who have no political rights, should be held to have the power to deprive the respondent of his natural right to make the most advantageous use of his talents, unless that construction of the Constitution is absolutely necessary to give affect to the general purposes of the instrument. The effect of the prohibition ought not to be enlarged by conjecture or implication (*Settle* v. *Van Evrea, supra,* 285), and a perfectly harmonious construction of section 20 of article 6, giving that provision a reasonable field of operation, covering, so far as we are informed, the limit of the mischief which brought it into being, gives no occasion for construing the word "population" *to mean more than the citizenship within the county.*

If we are right in reaching the conclusion above stated, the other questions involved are much simplified. By the provisions of chapter 934 of the Laws of 1895, a portion of Westchester county, embracing the towns of Westchester and Pelham, and the first and second election districts of the town of Eastchester, was annexed to the city and county of New York, and the validity of this act was

determined in *People ex rel. Henderson* v. *Supervisors* (147 N. Y. 1). The last enumeration of the inhabitants of this State was taken in 1892, and this formed the basis of the action of the Constitutional Convention of 1894. At that time the county of Westchester con. tained 145,106 inhabitants, using the word in its broadest sense, and of this number 129,224 were citizens, and 15,882 aliens. After the act of 1895 went into effect, the population was reduced by the number of inhabitants contained in the annexed district, and a computation based upon the figures of the enumeration of 1892, the only one which can form a basis for the political action of the State, shows that there were 130,300 persons all told, of which number 116,481 were citizens and 13,879 were aliens. It thus appears from the figures furnished by the last enumeration made in this State, that Westchester county *has not a population for governmental or political purposes in excess of 120,000*, and the respondent does not, therefore, come within the prohibition of the Constitution, so far as we have any judicial knowledge.

But it is urged that under the census of the United States government, taken in 1900, the population of the county is shown to be 184,257, and we are furnished a certificate of the acting director of the census that, " according to the official count of the returns of the Twelfth United States Census, the total population of the county of Westchester, in the State of New York, is one hundred and eighty-four thousand two hundred and fifty-seven," but there is nothing to indicate what portion of this number are aliens, nor is there any certificate that this is the actual number of inhabitants, so that unless this court may take judicial notice of the facts set forth in the United States census, for the purpose of determining a purely local and governmental or political question, involving no rights of property, the certificate can serve no useful purpose here, and must be disregarded; for it is a maxim of the law that " Where the Court cannot take judicial notice of a fact, it is the same as if the fact had not existed." (Broom Leg. Max. 121, *163.) The United States census is not taken by an officer owing any duty to the State of New York in the discharge of his duties; he may be a citizen of a foreign State, and we are called upon to give full faith and credit only to " the public acts, records and judicial proceedings of every other State " (U. S. Const. art. 4, § 1), and not to the United States, which,

in every matter not delegated to its care, is a foreign government. (U. S. Const. 10th amendt.; *United States* v. *Cruikshank*, 92 U. S. 542, 560, 561.) The State of New York, before there was any United States, had adopted its governmental and political system; had adopted its system of enumerating its citizens for the purpose of maintaining the political equilibrium of the various localities, and this power has never been delegated to the United States or prohibited to this State, so that under the tenth amendment of the United States Constitution we still have this power, and it is the only method fixed upon by our Constitution for the accomplishing of this purpose. *The judiciary article (Const. [1894] Art. 6, § 1) specially recognizes the enumeration provision as determining the population of the judicial districts in reapportioning the same, and as this is the only method of determining the population of the State for its governmental and political purposes, we see no way of avoiding the conclusion that in determining the population of Westchester county we are to look to the method fixed by the Constitution itself, and that this is to be interpreted in accord with the great purposes for which it was adopted, the government of the State by the citizenship of the State.* This seems to us a wholesome view of the question — one consistent with the dignity of the instrument under which we are called upon to administer the laws — and one which has in it less potentiality of evil than to hold that persons having no governmental or political relations to the State may, by their mere presence, defeat the natural right of an individual to make such use of his faculties as he may, consistently with the discharge of his official duties, which we must assume, in the absence of evidence to the contrary, will be discharged in accordance with the spirit and tenor of the oath of office. This view of the question does not defeat any legitimate end of the Constitution; it leaves the provision operative whenever the conditions demanding it arrive, or whenever the Legislature may decide to act upon the authority conferred by section 20 of article 6. The provision remains; the conditions under which it becomes applicable in Westchester county have not yet become judicially known to the court, and until that time arrives there is no occasion for this court to interfere with the orderly conduct of those who practice at its bar.

The conclusion which we have reached is in accord with the informal correspondence between Hon. SMITH LENT, county judge of Westchester county, and this court, under dates of December 18, 1896, December 19, 1896, and December 22, 1896, and is in harmony with the spirit of *Settle* v. *Van Evrea* (*supra*) ; *People ex rel. Williams* v. *Dayton* (55 N. Y. 367); *People ex rel. Lawrence* v. *Mann* (97 id. 530); *People ex rel. Lent* v. *Carr* (100 id. 236), and generally with the utterances of an enlightened jurisprudence, which finds no delight in limiting the legitimate activities of mankind in any walk of life.

The motion to suspend the respondent, Mr. Silkman, from the practice of his profession is in all things denied.

GOODRICH, P. J. (dissenting) :

I agree with Mr. Justice HIRSCHBERG when he says that, assuming it to be true that the county of Westchester contained a population exceeding 120,000 when Mr. Silkman was elected surrogate, "he was by the express terms of the Constitution at once suspended from practice as effectively as he could possibly be by any order of this court."

If the population of Westchester county exceeded 120,000 when Mr. Silkman was elected surrogate, and he continued thereafter to practice as an attorney or counselor in any court of record in this State, he disobeyed the fundamental law of the State, and, in my opinion, is guilty of malpractice, the definition of which is given in standard dictionaries, as follows : Webster defines it as "Evil practice ; illegal or immoral conduct ; practice contrary to established rules." The Century defines it as "Misbehavior ; evil practice ; practice contrary to established rules." The Standard defines it as "Improper or immoral conduct ; objectionable practice." Worcester defines it as "Practice contrary to rules."

I do not agree with Mr. Justice HIRSCHBERG that if Mr. Silkman has violated the inhibition of the Constitution, he has offended as surrogate and not as attorney. True it is that for any breach of the constitutional inhibition, which by his official oath he swore he would support, he might be impeached in his office of surrogate, but it is not his acting as surrogate, but his acting as attorney and counselor that we are considering. Over the former we have no

jurisdiction.   Over the latter we have jurisdiction under section 67 of the Code of Civil Procedure, as well as by the inherent power of the court, and by proper method may suspend him from practice or remove him from office as attorney and counselor.

Can it be doubted that if Mr. Silkman were to be impeached as surrogate for disobedience of the constitutional provision this court could suspend or disbar him on that account?

It seems to be conceded by the counsel of Mr. Silkman that since his election as surrogate he has practiced as attorney and counselor in courts of record in this State.   It is conceded that by the State census of 1892 Westchester county contained 130,360 inhabitants, of whom 116,481 were citizens and 13,879 were aliens.

Mr. Endlich in his Interpretation of Statutes (§ 2) says : " The first and most elementary rule of construction is, that it is to be assumed that the words and phrases are used in their technical meaning if they have acquired one, and in their popular meaning if they have not."   At section 507 he says : " Like other instruments a constitution is entitled to a construction as nearly as may be in accordance with the intent of its makers, who, in this case, are the people themselves.   Whilst, therefore, phrases that have acquired a settled meaning thoroughly understood, not only in legal parlance, but in common acceptation, are to be given that significance when used in a constitution,   *   *   *   where a phrase has both a technical and a popular meaning the former, which would ordinarily prevail in a statute, will be discarded for the latter in a constitutional provision.   Indeed, the language of the constitution, owing its whole force to its ratification by the people, is always to be taken in its common acceptation, its plain, ordinary, natural, untechnical sense.   *   *   *   It follows that where the words of a constitutional provision, taken in their ordinary sense and in the order of their grammatical arrangement embody a definite meaning, which involves no absurdity or conflict with other parts of the same instrument, the meaning thus apparent on the face of the provision is the only one that can be presumed to have been intended, and there is no room for construction."

With this standard authority in mind let us consider the meaning of article 6, section 20 of the Constitution.   The word " population " there used does not seem to me to be synonymous with the

words "inhabitants, excluding aliens," in sections 4 and 5 of article 3. It may be synonymous with "inhabitants," but the use of the words "excluding aliens" shows that inhabitants include aliens. Hence, we may not exclude aliens in construing section 20 of article 6 where the word "population" is used without any limiting words.

The words "inhabitants, excluding aliens" are used in sections 4 and 5 of article 3, in reference to the exercise of political powers, while in article 6, section 20, the word "population" is used with reference to judicial functions. In the exercise of political power aliens are not entitled to consideration as they have no participation therein, but their rights are to be regarded in respect of judicial functions, which may come to have jurisdiction over their property. I again refer to the standard dictionaries for the ordinary, untechnical meaning of the word "population," that is, its common acceptation. Webster's, Worcester's, the Century and Standard dictionaries substantially agree in defining "population" as "the whole number of people or inhabitants in a country or district." In my opinion the word "population" in article 6, section 20, includes all individuals resident in a county; and as it appears by the census that the number of such persons in the county of Westchester is more than 120,000, the section forbids the surrogate of that county to practice as an attorney or counselor in any court of record of this State or to act as referee.

It remains only to consider whether in the present proceeding an order may be made suspending Mr. Silkman from practice. I find adequate power in section 67 of the Code of Civil Procedure, which provides that an attorney who has been guilty of malpractice may be suspended from practice or removed from office by the Appellate Division of the Supreme Court. There is no prerequisite of motion to the court. The court may act of its own motion. The attention of the court having been called to the matter, we are called upon to act.

Motion denied, without costs.